EDWIN BARTLETT, PLAINTIFF IN ERROR, v. GEORGE P. KANE.

By the Tariff Act of 1842, the custom-house appraisers are directed to ascertain, estimate and appraise, by all reasonable ways and means in their power, the true and actual market value of goods, &c., and have power to require the production, on oath, of all letters, accounts, or invoices relating to the same. If the importer shall be dissatisfied with the appraisement, he may appeal to two merchant appraisers.

Where there was an importation of Peruvian bark, and the appraisers directed a chemical examination to be made of the quantity of quinine which it contained, although the rule may have been inaccurate, yet it did not destroy the validity of the appraisement.

The importer having appealed, and the appraisers having then called for copies of letters, &c., the importer withdrew his appeal without complying with the requisition. The appraisement then stands good.

The appraisers having reported the value of the goods to be more than ten per cent. above that declared in the invoice, the collector assessed an additional duty of twenty per cent. under the eighth section of the act of 1846, (9 Stat. at Large, 43.) This additional duty was not entitled to be refunded, as drawback, upon reexportation.

THIS case came up by writ of error, from the Circuit Court of the United States for the District of Maryland.

It was an action brought by Bartlett against Kane, who was the collector of the port of Baltimore, for the refunding of certain duties alleged to be illegally exacted upon the importation of Peruvian bark.

The circumstances of the case are fully stated in the opinion of the court.

It was argued by *Mr. Brune* and *Mr. Brown*, for the plaintiff in error, and by *Mr. Cushing*, (Attorney-General,) for the defendant.

The points and authorities relied upon by the counsel for the plaintiff in error, were the following:

1st. That the true dutiable value of the goods imported by the plaintiff in error, which were the production of Bolivia, and exported from that country by Messrs. Pinto & Co., to whom they belonged, was their market value in Bolivia, at the time of their procurement by Messrs. Pinto & Co.

2d. That if said goods are to be considered as exported from Peru, their true dutiable value was their market value in Bolivia at the date of their exportation from Peru; and the court below, which seems to consider them as exported from Peru, then erred in declaring that the law in such case fixes the duties upon the market value at the place of exportation.

3d. That as Bolivia was not an open market in which bark could be purchased during the continuance of the contracts between Pinto & Co. and the Bolivian government, the cost

price to Messrs. Pinto & Co. of the said goods, under their contracts of monopoly with the Bolivian government, must be esteemed the market value of said goods in Bolivia, for the purpose of fixing the dutiable value of said goods, whether considered as exports from Bolivia or Peru.

4th. That the invoice value of said goods which was declared on the entry, and upon which duty was then paid by the agents of the plaintiff in error, is clearly shown, by the evidence, not only to have been greater than the cost price to Messrs. Pinto & Co. under their said contracts, but was also fully equal to the value of such goods in the markets of Peru up to the period of their shipment from that country.

5th. That whatever may be the rule of law establishing the true dutiable value of said goods, their dutiable value as mentioned in the invoice, duly verified and declared on the entry, must be deemed their true dutiable value until superseded by a valid appraisement, fixing a different value.

6th. That the appraisement by which the dutiable value of the said goods was raised, and the importer was subjected to the additional duty prescribed by the eighth section of the act of 1846, was illegal and void, and the duties thus claimed and paid under said appraisement, were illegally exacted.

7th. That the court below erred in refusing the plaintiff's second prayer, and in the opinion which was given to the jury, by which it decided as a matter of law, and without submitting any facts to be found by the jury that said appraisement was valid.

8th. That the non-compliance of the plaintiff in error with the requirements of the appraisers, contained in their letter of the 6th of October, 1849, did not make valid the illegal appraisement of his goods, previously made, and then still appealed from.

9th. That the court below erred in refusing to grant the plaintiff's third and fourth prayers; and also in the opinion which it gave, by which it instructed the jury absolutely, and without submitting any facts to be found by them, that the plaintiff, by his conduct, had fixed the correctness of the said appraisement.

10th. That the court erred in rejecting the plaintiff's fifth prayer, and in instructing the jury that the plaintiff was not entitled to recover any part of the sum exacted by the defendant in error, as additional duty under the eighth section of the act of 1846, upon the goods entered by the plaintiff for warehouseing and subsequently exported.

To maintain the first seven points, having reference to the true dutiable value of the goods, and the invalidity of the ap-

praisement by which this value was raised, the plaintiff in error relies on the following acts of Congress: 1818, c. 79, 3 Stat. at Large, 433, and particularly to §§ 3, 4, 5, 9, 11, 12, 15, 16 and 17; 1823, c. 21, 3 Stat. at Large, 729, §§ 4, 5, 7, 8, 13, 14, 15, 16, 18, 19, 21; 1828, c. 55, 4 Stat. at Large, 270, §§ 8, 9; 1830, c. 147, 4 Stat. at Large, 409, §§ 1, 2, 3, 4; 1832, c. 227, 4 Stat. at Large, 583, §§ 7, 8, 15; 1833, c. 55, 4 Stat. at Large, 629, § 3; 1842, c. 270, 5 Stat. at Large, 548, §§ 16, 17, 21, 22, 23, 24; 1846, c. 74, 9 Stat. at Large, 42, §§ 1, 8, 11, schedule F.

And, by way of illustration, to the act of 1851, c. 38, 9 Stat. at Large, 629. And the Treasury Circular of the 27th of March, 1851, construing the same.

And the following authorities: Tappan v. The United States, 2 Mason, 396; Tappan v. The United States, 11 Wheat. 420 to 427; Tracy v. Swartwout, 10 Peters, 94, 95; Elliot v. Swartwout, Ib. 153–157; Marriott v. Brune, 9 Howard, 634, 635; Greely v. Thompson, 10 Howard, 225–241; Maxwell v. Griswold, Ib. 247 to 254; Reggio v. Greely, Mss. Mass. Circuit, June, 1851; Grinnell v. Lawrence, 1 Blatchford, 348–350.

To maintain his 8th and 9th points, the plaintiff in error refers to 1823, c. 21, 3 Stat. at Large, 729, §§ 16, 17; 1830, c. 147, 4 Stat. at Large, 409, § 3; 1832, c. 227, 4 Stat. at Large, 583, §§ 7, 8; 1842, c. 270, 5 Stat. at Large, 548, §§ 16, 17; 1848, c. 70, 9 Stat. at Large, 237.

And to Tappan v. The United States, 2 Mason, 403; Grinnell v. Lawrence, 1 Blatchford, 350; Tucker v. Kane, Mss. Md. Circuit; Reggio v. Greely, Mss. Mass. Circuit, June, 1851; Watson on Arbitrations, 59 Law Library, 36; Russell on Arbitrations, 63 Ib. 151; Tracy v. Swartwout, 10 Peters 95–96; Marriott v. Brune, 9 Howard, 634; Greely v. Thompson, 10 Howard, 229–238.

To maintain his 10th point he refers to the acts of 1799, c. 22, 1 Stat. at Large, 627, particularly §§ 56, 75, 76, 77, 78, 80, 81, 84; 1816, c. 107, 3 Stat. at Large, 310, § 4; 1818, c. 129, 3 Stat. at Large, 467; 1823, c. 21, 3 Stat. at Large, 729, §§ 28–37; 1830, c. 147, 4 Stat. at Large, 409, § 5; 1842, c. 270, 5 Stat. at Large, 548, §§ 12, 13, 15; 1846, c. 7, 9 Stat. at Large, 3, § 3; 1846, c. 84, 9 Stat. at Large, 53, §§ 1, 2; Treasury Circular of 12th June, 1847; Tremlett v. Adams, 13 Howard, 303.

The Attorney-General contended:

The said appraisement was final and conclusive upon the withdrawal of the appeal.

After enumerating the statutory provisions upon the subject, he said,

From the enactments of the statute, it is clear that the ap-

praisement by the custom-house appraisers becomes final and conclusive upon either of these events; by the failure of the owner, importer, or consignee, to ask an appeal to merchant appraisers, or by withdrawing that appeal after taken, or by refusing to produce the letters or accounts relating to the goods imported.

The statute cannot be evaded by taking an appeal and then withdrawing it, with notice of an intent to bring the question of the true market value before the judicial tribunals; nor by taking an appeal, refusing to produce the letters and accounts required, and withdrawing the appeal under protest against the appraisement appealed from, with notice that the appellant means to contest the appraisement and present his documents, called for by the appraisers, before a tribunal other than the merchant appraisers.

The statute has provided the appellate tribunal to settle finally the question of the true market value of the goods when the importer, owner, or consignee is dissatisfied with the appraisement, by the custom-house appraisers. That final appellate tribunal is to consist of merchants, " two discreet and experienced merchants, citizens of the United States, familiar with the character and value of the goods in question." The ingenuity of the plaintiff cannot draw this question *ad aliud examen.*

The plaintiff says, " In looking more carefully to the requisition of your appraisers of bark per St. Joseph, I find that I shall have to have copied and translated a mass of correspondence from January last, when it was shipped, to August, (for reference to it is made in all my letters from Pinto & Co., and Alsop & Co.); and in order the more fully to explain Pinto & Co.'s mode of invoicing their bark, I shall have to present a series of documents, commencing in 1847, with their contract with the Bolivian government, proving its actual cost to be about $60 per quintal: all these are necessary to make out my own case, and I am unwilling to present less than all the documents. I do not see, however, of what use they can be at present to the appraisers, who have already made up their valuation of the bark, and made a return to the collector. I shall therefore defer the presentation of my documents for another tribunal, and not lose more time in delivering the bark to the purchaser. I wish you to inform the collector that by my instructions your appeal is withdrawn, and that you are prepared to pay, under protest, whatever duties may be exacted on the bark. . . . . At leisure we can then test the question of this exaction."

In plaintiff's second letter to his agents, he says : " One reason I have for taking the course directed in my letter of this date is, that my counsel informs me that I can more easily get the bark case into court before the appeal appraisement be re-

sorted to than afterwards. Some of our judges have held that an appeal appraisement is final and conclusive."

The plaintiff professed not to see what use could be made of the letters and correspondence called for after the appraisement by the custom-house appraisers had been reported to the collector. It would have been useful evidence before the merchant appraisers if the plaintiff had not withdrawn his appeal rather than to produce those letters, accounts, and correspondence. They might have enlightened the merchant appraisers. They might have enlightened the custom-house appraisers to amend or correct their report to the collector, for the duties were not then fixed and imposed. Did the plaintiff conjecture that the merchant appraisers, to whom he had appealed, were to decide without hearing any evidence? That the government was debarred from introducing evidence to sustain the appraisement appealed from?

The pretences in the plaintiff's letter of inability to see the use to be made of the letters and correspondence called for; that he would " defer the presentation of the documents for another tribunal" than the merchant appraisers, and that he could " more easily get the bark case into court before the appeal appraisement be resorted to than afterwards," cannot enable the plaintiff to evade the force and effect of the seventeenth section of the act of 1842.

The " actual market value or wholesale price," at the time when the article was purchased, in the principal markets of the country from which the same shall have been imported into the United States, is a question of fact, not of law.

The sixteenth and seventeenth sections of the act quoted plainly make the ascertainment of that fact an executive function; an adminstrative, not a judicial process. The particular executive and administrative jurisdiction and process are carefully specified in the law in a manner to exclude all other jurisdictions, and to make the ascertainment of the fact, by that particular jurisdiction, " final and conclusive."

The statute, if the owner, importer, or consignee be dissatisfied with the appraisement of the goods, has given a remedy by an appeal, " forthwith," to merchant appraisers: *Expressio unius est exclusio alterius.* The express mention of the one remedy is the exclusion of another. Co. Litt. 210; Broom's Legal Maxims, 515, 516; the King v. Cunningham, 5 East, 478, 480; the King v. the Justices of Surrey, 2 Durnf. & E. 510; Cates v. Knight, and same v. Mellish, 3 Durn. & E. 444.

The fact to be thus ascertained is of vital importance to the revenue. The means given are necessary to protect the revenue from diminution by evasions and frauds requiring promptitude.

The Congress have intended that the fact shall be speedily ascertained and adjusted, finally and conclusively fixed " forthwith," as quickly as may be after the master of the vessel shall have made entry of the cargo, as it were *velis levatis ;* for it is a fact preceding the computation and payment of the duties ; in its nature, purpose, and effect, an executive and administrative business. The views and ends intended in this respect cannot be answered by the dilatory proceedings of the courts.

II. No drawback is recoverable of the penal duty of twenty per cent. in addition to the regular duty inflicted by law, and paid on one hundred and twenty-five seroons of bark afterwards reëxported from the port of Baltimore to foreign parts.

The duty of fifteen per cent. *ad valorem* has been refunded upon the seroons of bark so reëxported to foreign parts.

This question as to the penal duty is so plain, as to afford little room for argument. The twenty per cent. is a rated penalty, inflicted for an attempt to defraud the revenue by an invoice and entry of the goods at the custom-house at an undervalue.

After the fact committed, the fraud detected, and the penalty paid, the party cannot demolish the fact, wipe out the fraud, and claim that the penalty shall be remitted because he has found it for his interest to reëxport the merchandise to a foreign country. By such a construction of the statute, the law would be stripped of its sanction, and terror to offenders.

The construction given by the Secretary of the Treasury, (Mr. Walker,) in his circular of the 12th of June, 1847, to the collectors, pp. 36, 37, is, that this is a "penal duty." . . . "This penal duty is not a subject of drawback, and cannot be returned on debenture : " . . . "such penalty is never returned on exportation of such goods."

On October 25, 1849, plaintiff applied to the Secretary of the Treasury (Mr. Meredith) for instructions to the collector to return "the excess of duty above that which would have accrued on the original and true invoice of the bark," pp. 13 to 15. To this the Secretary wrote to the collector the letter of February 14, 1850, p. 15, and to the plaintiff the letter of same date, p. 16, in which he instructed the collector, and answered the plaintiff, "that the ' additional duty' imposed in all cases of undervaluation, to a certain extent, was intended, and must be considered as entirely distinct in character and object from the regular tariff rates of duty exclusively in view when the law regulating the drawback of duties was enacted ; and that consequently no return of such ' additional duty' could be legally made as debenture. It is thought proper to add, that the practice heretofore pursued, under the instructions of the department, has been uniformly governed by these views."

The views above quoted are not binding on this court. As contemporaneous constructions of the department charged by law with superintending the collection of the revenue from customs, however, they will draw forth the serious deliberations of this court, and will be suffered to stand unless some good cause can be found to the contrary.

Mr. Justice CAMPBELL delivered the opinion of the court.

This suit was commenced by the plaintiff as consignee of six hundred and fourteen seroons of Peruvian bark imported into the port of Baltimore, and entered at the custom-house, for an excess of duties charged by the defendant as collector, and paid under protest. Two hundred seroons of the first quality were entered for consumption, and the remainder for warehousing. On the 4th of October, 1849, the appraisers of the custom-house reported the value of the invoice to be ten per cent. and more, above the value declared by the agents of the plaintiff who made the entry, and in consequence the collector, besides the legal duty of fifteen per cent. *ad valorem,* assessed an additional duty of twenty per cent. under the eighth section of the act of 1846, 9 Stat. at Large, 43, c. 74, for undervaluation. On the 6th of October, 1849, the plaintiff duly protested against the appraisement, and requested that the case might be submitted to merchant appraisers, as provided by law. After notice of the appeal, the same day, the permanent appraisers required the plaintiff " to produce all their correspondence, letters, and accounts, relative to the shipment, and to make a deposition that the documents furnished were all that he had concerning the shipment."

In reply to this, some five days after, the plaintiff instructed his agents that it would be tedious and difficult to comply with the requisition, in consequence of the volume of the correspondence, says he cannot understand what use the appraisers could make of them, as they had made their report; that he should defer their presentation for another tribunal, and that he withdraws his appeal, and will pay the duties under protest. He still insists upon the overvaluation, but offers to settle at that rate, provided the additional duty is not charged. He says that this exaction is illegal, and they can test it at their leisure. That he had been advised that an appeal appraisement might interfere with his rights in a court of justice.

These letters of the plaintiff were submitted to the permanent appraisers, who replied they could make no alteration of their estimate, and the appeal of the plaintiff was withdrawn. The plaintiff paid the entire duties exacted upon the appraised value of the entire import, including those entered for consumption as

23 *

well as warehousing, and an additional duty of twenty per cent. for undervaluation. These sums were paid under protest. A portion of the bark was exported, and upon this the plaintiff became entitled to drawback, which was paid to the extent of the regular duty, but the additional duty was not refunded.

The complaint of the plaintiff is, that the appraisers, instead of estimating the value of the Peruvian bark, according to the cost price in the markets of its production, under the directions of the Secretary of the Treasury, caused a chemical analysis of samples to be made to ascertain the quantity of sulphate of quinine it contained, and, having ascertained its relative intrinsic value with other imports of the same article, regulated its appraised value by a comparison with the cost of such imports. The facts and the complaint were submitted to the Secretary of the Treasury, who replied as follows:

"It appears from the report of the United States appraisers, dated 20th October last, that the dutiable value of the article in question having been estimated and sustained by them in conformity with law, it was found that the appraised value exceeded, by ten per cent. or more, the value declared in the entry, and that an appeal from this appraisement, entered by the importer, was subsequently withdrawn by him. Under these circumstances it necessarily follows that the original appraisement, made by the United States appraisers, is to be taken as final and conclusive in determining the dutiable value, and that such value, exceeding by ten per cent. or more the value declared in the invoice and entry, the 'additional duty' of twenty per cent., as provided in the eighth section of the Tariff Act of 1846, is chargeable under the law, in addition to the regular tariff rate of fifteen per cent. ad valorem, levied on the enhanced value of the article in question. A supplemental question in reference to this importation having been submitted to the department, under date of 7th instant, namely, whether the importer is not entitled to the return of that portion of the 'additional duty' paid on that part of the importation withdrawn from warehouse by the importer, and exported from the United States, I have to advise you that, upon a careful examination of the subject, it is the opinion of the department that the 'additional duty' imposed in all cases of undervaluation, to a certain extent, was intended, and must be considered as entirely distinct in character and object from the regular tariff rates of duty exclusively in view when the laws regulating the drawback of duties were enacted; and that, consequently, no return of such 'additional duty' could be legally made as debenture. It is thought proper to add, that the practice heretofore pursued under the instructions of the department has been uniformly governed by these views."

Much evidence was given at the trial to prove that the value declared by the agents of the consignee at the time of the entry was strictly accurate, and that the rule of valuation adopted at the custom-house was deceptive, and injurious to the importer.

The conclusions of the Secretary of the Treasury, as before set forth, were sustained in the Circuit Court, and form the subject for examination in this court.

By the sixteenth section of the Tariff Act of 1842, (5 Stat. at L. 563, c. 270,) it is prescribed to the appraisers, by all reasonable ways and means in his or their power, to ascertain, estimate, and appraise the true and actual market value, and wholesale price, any invoice or affidavit thereto to the contrary notwithstanding, of the said goods, wares, and merchandise, at the time purchased, and in the principal markets of the country wherever the same shall have been imported into the United States, with the proviso, that whenever the same shall have been imported into the United States from a country in which the same have not been manufactured and produced, the foreign value shall be appraised and estimated according to the current market value, or wholesale price of similar articles at the principal markets of the country of production or manufacture at the period of the exportation of said merchandise to the United States. The seventeenth section of the act authorizes the appraisers to call before them, and examine upon oath the owner, importer, consignee, or other person, "touching any matter or thing which they may deem material in ascertaining the true market value, or wholesale price of any merchandise imported; and to require the production on oath to the collector, or to any permanent appraiser of any letters, accounts, or invoices in his possession relating to the same, for which purpose they are hereby respectively authorized to administer oaths and affirmations; and if any person so called shall neglect or refuse to attend, or shall decline to answer, or shall, if required, refuse to answer in writing any interrogatories, or produce such papers, he shall forfeit and pay to the United States the sum of one hundred dollars; and if such person be the owner, importer, or consignee, the appraisement which the said appraisers . . . . . may make of the goods, wares, and merchandise, shall be final and conclusive, any act of Congress to the contrary notwithstanding. . . . . .

" Provided that if the importer, owner, agent, or consignee of any such goods shall be dissatisfied with the appraisement, and shall have complied with the foregoing requisitions, he may forthwith give notice to the collector, in writing, of such dissatisfaction, on the receipt of which the collector shall select two discreet and experienced merchants, citizens of the United

States, familiar with the character and value of the goods in question, to examine and appraise the same agreeably to the foregoing provisions; and if they shall disagree the collector shall decide between them, and the appraisement thus determined shall be final, and deemed and taken to be the true value of the said goods, and the duties shall be levied thereon accordingly, any act of Congress to the contrary notwithstanding."

The plaintiff contends that the rule of appraisement by which the dutiable value of the said goods was raised, and the importer was subjected to the additional duty prescribed by the eighth section of the act of 1846, was illegal and void, and the duties thus claimed and paid under said appraisement were illegally exacted. It may be admitted that the rule, if strictly applied, would in many cases lead to erroneous results, and could not be relied upon as a safe guide in any case, but this admission does not establish the nullity of the appraisement. The appraisers are appointed "with powers, by all reasonable ways and means, to ascertain, estimate, and appraise the true and actual market value and wholesale price" of the importation. The exercise of these powers involve knowledge, judgment, and discretion. And in the event that the result should prove unsatisfactory, a mode of correction is provided by the act. It is a general principle, that when power or jurisdiction is delegated to any public officer or tribunal over a subject-matter, and its exercise is confided to his or their discretion, the acts so done are binding and valid as to the subject-matter. The only questions which can arise between an individual claiming a right under the acts done, and the public, or any person denying their validity, are power in the officer and fraud in the party; all other questions are settled by the decision made, or the act done by the tribunal or officer, whether executive, legislative, judicial, or special, unless an appeal is provided for, or other revision by some appellate or supervisory tribunal is prescribed by law." United States v. Arredondo, 6 Pet. 691.

The interference of the courts with the performance of the ordinary duties of the executive departments of the government would be productive of nothing but mischief; and we are satisfied that such a power was never intended to be given to them. Decatur v. Paulding, 14 Pet. 499.

The interposition of the courts, in the appraisement of importations, would involve the collection of the revenue in inextricable confusion and embarrassment. Every importer might feel justified in disputing the accuracy of the judgment of the appraisers, and claim to make proof before a jury, months and even years after the article has been withdrawn from the control of the government, and when the knowledge of the

transaction has faded from the memories of its officers. The consignee, after he has been notified of the appraisement, is authorized to appeal, and pending the appeal we can see no reason why he may not negotiate with the officers of the customs to correct any error in their judgment. We do not perceive a reason for holding that their control of the subject is withdrawn by the fact of the appeal. The appeal is one of the reasonable ways and means allowed to the importer for ascertaining the true and dutiable value, paramount in its operation to any other when actually employed, but until employed not superseding those confided to the officers. We think, therefore, that the permanent appraisers under the sanction of the collector, (which is to be presumed,) when informed that their decision was contested, had the right to call for the production of the correspondence, and that the plaintiff could not have prosecuted the appeal without a compliance with the requisition.

In this case the plaintiff neither complied with the requisition nor prosecuted the appeal, but withdrew it, and settled the duties on the basis of the appraisement of the permanent appraisers. After this, we think he could not dispute the exactness of the appraisement. In Rankin *v.* Hoyt, 4 How. 327, being the case of a disputed appraisement, the jury found the invoice to be correct, and it was urged that the collector could not be justified in following the higher valuation of the appraisers. The court say "that an appraisal made in a proper case must be followed, or the action of the appraisers would be nugatory, and their appointment and expenses become unnecessary. The propriety of following it cannot, in such a case, be impaired by the subsequent verdict of the jury, differing from it in amount, as the verdict did not exist to guide the collector when the duty was levied, but the appraisal did, and must justify him, or not only the whole system of appraisement would become worthless, but a door be opened to a new and numerous class of actions against collectors, entirely destitute of equity. We say destitute of it, because, in case the importer is dissatisfied with the valuation made by the appraisers, he is allowed by the act of Congress, before paying the duty, an appeal and further hearing before another tribunal."

In the case before us the plaintiff withheld the information which might have satisfied the officers of the government, after a legal requisition upon him. He abandoned the claim for a hearing before "persons familiar with the character and value of the goods in question," "discreet and experienced merchants," and preferred a tedious and vexatious litigation. We think, as was said by the court in the case above cited, "he cannot with much grace, complain afterwards that any overestimate existed."

We shall now inquire whether, upon the reëxportation of the Peruvian bark entered for warehousing, the plaintiff was entitled to a return of the twenty per cent. of additional duty charged upon the portion so exported.

An examination of the revenue laws upon the subject of levying additional duties, in consequence of the fact of an undervaluation by the importer, shows that they were exacted as discouragements to fraud, and to prevent efforts by importers to escape the legal rates of duty. In several of the acts, this additional duty has been distributed among officers of the customs upon the same conditions as penalties and forfeitures. As between the United States and the importer, and in reference to the subject of drawback and debenture, it must still be regarded in the light of a penal duty.

The provision for the return of the duty upon a reexportation, formed a part of the system of regulations for importation and revenue from the earliest period of the government, and has always been understood to establish relations between the regular and honest importer and the government.

It does not include, in its purview, any return of the forfeitures or amercements resulting from illegal or fraudulent dealings on the part of the importer or his agents. Those do not fall within the regular administration of the revenue system, nor does the government comprehend them within its regular estimates of supply. They are the compensation for a violated law, and are designed to operate as checks and restraints upon fraud and injustice. A construction, which would give to the fraudulent importer all the chances of gain from success, and exonerate him from the contingencies of loss, would be a great discouragement to rectitude and fair dealing. We are satisfied that the existing laws relating to exportations, with the benefit of drawback, do not apply to relieve the person who has incurred, by an undervaluation of his import, this additional duty from the payment of any portion of it.

Our conclusion is, there is no error in the record, and the judgment of the Circuit Court is affirmed.

### Order.

This cause came on to be heard on the transcript of the record from the Circuit Court of the United States for the District of Maryland, and was argued by counsel. On consideration whereof, it is now here ordered and adjudged by this court, that the judgment of the said Circuit Court in this cause be, and the same is hereby affirmed, with costs.